Esther R. **KOCIEMBA** and William J.
Kociemba, Plaintiffs,

v.

**G.D. SEARLE & CO.**, Defendant.

Civ. No. 3–85–1599.

United States District Court,
D. Minnesota,
Third Division.

Sept. 1, 1988.

Michael V. Ciresi, Roger P. Brosnahan, David L. Suggs, Roberta Walburn of Robins, Larson, Miller & Ciresi, Minneapolis, Minn., for plaintiffs.

Paul Strain and Elizabeth Honeywell of Venable, Baetjer & Howard, Baltimore, Md., and Madge S. Thorsen of Oppenheimer, Wolff & Donnelly, Minneapolis, Minn., for defendant.

## MEMORANDUM AND ORDER

RENNER, District Judge.

Before the Court is defendant's motion for directed verdict on the design defect issue. In essence, defendant requests this Court to reconsider its February 1, 1988 Order holding that the factfinder must determine the applicability of comment k to § 402A of the Restatement (Second) of Torts on a case-by-case basis.[1] *Kociemba v. G.D. Searle & Co.*, 680 F.Supp. 1293, 1300–1301 (D.Minn.1988). Defendant, citing *Brown v. Superior Court*, 44 Cal.3d 1049, 245 Cal.Rptr. 412, 751 P.2d 470 (1988), would have this Court hold that comment k applies to all prescription drugs as a matter of law regardless of whether a design defect cause of action is brought in negligence or strict liability. Accordingly, defendant argues that the only design defect issue that should be before the jury is whether Searle adequately warned plaintiffs of the risks of Cu–7 use.

The Minnesota appellate courts have not had an opportunity to determine whether

---

1. Comment k provides that:

There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warnings, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot be legally sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and the use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

this jurisdiction would adopt comment k. When this Court first addressed the issue in its February 1, 1988 Order, the Court predicted that the Minnesota courts would adopt comment k if given the opportunity. *Kociemba*, 680 F.Supp. at 1300. This Court further held that comment k does not apply to all prescription drugs as a matter of law but that the jury must make that determination based on the following factors:

(i) whether the product could have been designed in a safer manner;

(ii) whether a safer alternative product could have been available at the time of manufacture and sale to accomplish the same intended purpose in questions; and

(iii) whether the benefits of the product outweigh the interest in promoting enhanced accountability on the part of the manufacturer.

*Kociemba*, 680 F.Supp. at 1301 *citing Patten v. Lederle Labs.*, 676 F.Supp. 233 (D.Utah 1987).

Upon review of the February 1, 1988 Order, this Court finds that the policy considerations underlying that Order are correct. However, for reasons stated below, this Court now finds that these policy considerations are implicitly reflected in the negligence-based "reasonable care" standard adopted by the Minnesota Supreme Court in strict liability design defect cases. *See Bilotta v. Kelley Co.*, 346 N.W.2d 616 (Minn.1984) and *Holm v. Sponco Mfg., Inc.*, 324 N.W.2d 207 (Minn.1982). Moreover, because of the importance this Court attaches to these policy considerations as they apply to prescription drugs, the Court further finds that it is appropriate to explicitly instruct the jury that it may consider the reasonable but unavoidable side effects of a prescription drug at the same time it considers the reasonableness of a design defect.

*Analysis:*

In 1966, Minnesota adopted § 402A of the Restatement (Second) of Torts which imposes strict liability on manufacturers of defective or unreasonably unsafe products. *McCormack v. Hankscraft Co., Inc.*, 278 Minn. 322, 336–341, 154 N.W.2d 488, 499–

501 (Minn.1967). Section 402A, as originally adopted by the Minnesota Supreme Court, employed a "consumer expectation" standard which holds that a product is unreasonably dangerous if it

is dangerous when used by an ordinary user who uses it with the knowledge common to the community as to the product's characteristics and common usage.

See JIG 118, paragraph 2, 4 Minnesota District Judges Ass'n, Minn.Pract. JIG II CIVIL (2d Ed.1974).

Under this standard, the manufacturer's conduct, whether egregious or highly responsible, is irrelevant. Rather, the factfinder, focusing solely on the condition of the product, can find a manufacturer liable even though the manufacturer reasonably could not know of the dangers inherent in its product.

Although strict liability can bring about a sometimes harsh result in that a reasonably-acting manufacturer can be found liable, the Minnesota Supreme Court adopted such an approach because of its belief that

enlarging a manufacturer's liability to those injured by its products more adequately meets public policy demands to protect consumers from the inevitable risks of bodily harm created by mass production and complex marketing conditions.

*Id.* at 338, 154 N.W.2d at 500.

The court added that strict liability:

imposes the costs of the injury upon the maker, who can both most effectively reduce or eliminate the hazard to life or health, and absorb and pass on such costs ...

*Id.*

Many jurisdictions have blunted the harshness of strict liability by adopting Comment k to § 402A. Under Comment k, a manufacturer is liable in a strict liability design defect case only if it fails to adequately warn the user of the unavoidable dangers.

The policy considerations behind comment k are straightforward: First, manufacturers should be encouraged to develop products such as prescription drugs even

though such products are incapable of being made safe given the present state of knowledge. Such encouragement can only be accomplished by limiting the manufacturer's liability to instances where the manufacturer acted in an unreasonable manner which, in comment k terms, occurs when the manufacturer fails to adequately warn the user of the reasonable dangers inherent in the product.

Second, holding drug manufacturers up to a "consumer expectation" standard for injuries caused by unavoidably unsafe but necessary prescription drugs can increase product liability insurance rates and litigation costs to the extent that drug manufacturers are not able to sell pharmaceutical products at affordable prices.

As noted above, the Minnesota Supreme Court has not addressed the issue of comment k. They have, however, adopted a balancing test, much like the balancing test utilized in comment k, which implicitly acknowledges the above policy considerations. *Bilotta*, 346 N.W.2d at 621–622; *Holm*, 324 N.W.2d at 213.

In *Holm*, and then in *Bilotta*, the Supreme Court completely rejected the "consumer expectation" standard of strict liability in favor of a negligence-like "reasonable care" standard which focuses on the conduct of the manufacturer rather than the condition of the product. *Bilotta*, 346 N.W.2d at 622.

The *Bilotta* Court rationalized its decision to adopt the "reasonable care" standard in strict liability design defect cases by noting that the "defect" in a design defect case "lies in a consciously chosen design" in which the manufacturer "deliberately added or omitted the challenged component and has presumably made that decision after balancing a variety of factors." *Id.* 346 N.W.2d at 622. Therefore, the *Bilotta* Court reasoned that the manufacturer's conduct in balancing its product's risk against its utility is the key element in determining liability. Factors a jury may consider in evaluating the manufacturer's conduct include:

(1) the usefulness and desirability of the product;

(2) the availability of other and safer products to meet the same need;

(3) the likelihood of injury and its probable seriousness;

(4) the obviousness of the danger;

(5) common knowledge and normal public expectation of the danger;

(6) the avoidability of injury by care in use of the product (including the effects of instruction or warning); and

(7) the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive.

*Krein v. Raudabough*, 406 N.W.2d 315, 318 (Minn.App.1987); *See Holm*, 324 N.W. 2d at 212; Wade, *Strict Liability of Manufacturers*, 19 S.W.L.J. 5, 17 (1965).

After *Holm* and *Bilotta*, strict liability and negligence have been, in effect, merged into one negligence-type standard of recovery in design defect cases. Accordingly, the drafters of the Minnesota Jury Instruction Guide have composed a single jury instruction to be read in all design defect cases. That instruction, JIG 117, reads:

A manufacturer has a duty to use reasonable care when designing a product, so as to avoid any unreasonable risk of harm to (anyone who) (property that) is likely to be exposed to harm when the product is put to its intended use or to any use that is unintended but is reasonably foreseeable.

What constitutes reasonable care will vary with the surrounding circumstances. Reasonable care is the care that a reasonably prudent person would exercise under the same or similar circumstances.

The reasonable care to be exercised by a manufacturer when designing a product will depend on all facts and circumstances, including, among others, the likelihood and seriousness of harm against the feasibility and burden of any precautions which would be effective to avoid the harm. You are instructed that the manufacturer is obligated to keep informed of scientific knowledge and discoveries in its field.

If the manufacturer did not use reasonable care when designing the product in question, then the product is in a defective condition unreasonably dangerous to the (user or consumer) (user's or consumer's property).

JIG 117, Minnesota District Judges Ass'n, Minn.Pract., CIVIL (3rd Ed.1986).

In the Court's view, this negligence-based standard implicitly includes the policy considerations underlying comment k. Analysis of the texts of JIG 117 and comment k reveals that both require a risk/utility balancing test to determine the reasonableness of the manufacturer's conduct in producing a given product. The major difference between the tests is that comment k explicitly provides that a manufacturer may act reasonably in manufacturing an unavoidably unsafe product while JIG 117 merely implies the same.

Because the balancing tests are essentially the same, it became clear that the Court should not give separate special verdict questions to reflect each balancing test. To do so would require the jury to conduct the same risk/utility balancing test twice. Moreover, the jury's possible decision to tip the balance in different directions could lead to perverse verdicts.

Rather, this Court adopted a position in which the jury can consider unavoidable but reasonable risks of a desirable product at the same time it considers the reasonableness of the manufacturer's conduct. To accomplish this, the jury received only one special verdict question on whether the Cu–7 was defectively designed. The jury was then given an instruction based on JIG 117 followed by an instruction which states:

A product prescribed by a physician is not negligently designed merely because it may have side effects.

Some products, given the present state of human knowledge cannot be made totally safe for their intended and ordinary use. Because of the nature of the ingredients or natural characteristics of the product, their use involves substantial risk of injury, and some users will necessarily be harmed. Thus, a manufacturer is not negligent merely because it supplies the public with an apparently useful and desirable product that has a known but apparently reasonable risk.

In taking this course of action, the Court reduces the possibility of perverse verdicts because the jury is only considering one balancing test. More importantly, these instructions strike a fair balance between the policy encouraging a manufacturer to produce useful but unavoidably dangerous products and the policy that a manufacturer be held accountable for unreasonable conduct. The manufacturer of a desirable yet unavoidably unsafe product is protected in that it will not be held liable if it uses reasonable care in manufacturing an inherently dangerous product. On the other hand, the consuming public is protected in that a manufacturer continues to be held accountable for its unreasonable behavior.

The need for this balanced approach is readily apparent given the evidence of this case. Defendant has brought forth evidence that all IUDs are unavoidably dangerous in that the insertion procedure unavoidably increases the chance of pelvic infection. Plaintiffs have brought forth evidence that the specific Cu–7 design unreasonably increases the risk of infection above and beyond the risk associated with the insertion procedure. If, for example, the jury accepts the above-cited evidence as true, the jury can, and should, consider Searle's reasonable conduct in developing an unavoidably unsafe but desirable product as well as its unreasonable conduct in not developing the safest possible IUD.

Consistent with this Court's February 1, 1988 opinion, the Court believes that such considerations are important and appropriate determinations that are best reserved for the factfinder regardless of whether plaintiffs bring their case in strict liability or negligence. For this reason, the Court rejects defendant's request to follow the California Supreme Court holding that comment k applies to all prescription drugs as a matter of law in strict liability design defect cases. *See Brown,* 751 P.2d at 482–483.

The Court further rejects *Brown*'s applicability here because California's products liability law is distinguishable from the law in this jurisdiction. In California, unlike Minnesota, strict liability is still based on the "consumer expectation" standard set forth in the Restatement. Thus, *Brown*'s holding that comment k applies to strict liability cases has no effect on whether a manufacturer can be liable on a negligence theory of recovery. Indeed, the *Brown* court explicitly notes that pharmaceutical manufacturers "are subject to liability for manufacturing defects, as well as under general principles of negligence." *Id.* 751 P.2d at 483, fn. 12.

In Minnesota, however, where strict liability has been merged with negligence, the application of *Brown* would eliminate both negligent and strict liability design defect causes of action in prescription drug cases except to the extent that a manufacturer is liable for its failure to warn the user of the inherent dangers of the drug. The Court declines to take this step. *But see Hill v. G.D. Searle & Co.*, 686 F.Supp. 720, 725–26 (D.Ark.1988) (Applying Arkansas law).

Accordingly, IT IS HEREBY ORDERED that defendant's motion for directed verdict on the design defect issue is denied.